**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DATA ENGINE TECHNOLOGIES LLC, | § § § | C.A. No. 14-cv-1115-LPS |
| Plaintiff, | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| GOOGLE INC., | § § | |
| Defendant. | § § | |

**PLAINTIFF DATA ENGINE TECHNOLOGIES LLC'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

Dated: November 3, 2015

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP 919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Amir Alavi (admitted *pro hac vice*)
Demetrios Anaipakos (admitted *pro hac vice*)
Alisa A. Lipski (admitted *pro hac vice*)
Jamie A. Aycock (admitted *pro hac vice*)
Benjamin Foster (admitted *pro hac vice*)
Kenneth Young (admitted *pro hac vice*)
AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
aalavi@azalaw.com
danaipakos@azalaw.com
alipski@azalaw.com
jamieaycock@azalaw.com
bfoster@azalaw.com
kyoung@azalaw.com

*Attorneys for Plaintiff*
*Data Engine Technologies LLC*

# TABLE OF CONTENTS

I.    ONE OF ORDINARY SKILL IN THE ART ........................................................................... 1

II.    OVERVIEW OF PATENTED TECHNOLOGY ................................................................... 1

III.    RELEVANT LEGAL STANDARDS ................................................................................. 4

IV.    AGREED CONSTRUCTIONS .......................................................................................... 6

V.    TERMS FOR CONSTRUCTION ..................................................................................... 6

   a.    U.S. Patent No. 5,784,545 ........................................................................................ 6

   b.    U.S. Patent No. 6,282,551 ........................................................................................ 9

   c.    U.S. Patent No. 5,623,591 ...................................................................................... 11

      i.    "linking" ............................................................................................................. 11

      ii.    "displaying said user interface object with a value of said property of the given cell object" ... 14

      iii.    "end-user input" ................................................................................................. 16

      iv. "in response to first user input, generating a user interface object/in response to third user input, generating a user interface object" / "receiving first user input for generating a user interface control of a plurality of different types" ............................................................... 18

   d.    U.S. Patent No. 5,303,146 ...................................................................................... 20

      i.    "different versions" ............................................................................................ 20

      ii.    "new version" ..................................................................................................... 21

      iii.    "base version" .................................................................................................... 22

      iv.    "specifying" ....................................................................................................... 23

      v. "maintaining the new version by storing additional information for only those portions determined to have changed' ........................................................................................ 24

VI.    CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

*Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997) ..................................................... 11

*Bicon, Inv. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). .......................................... 13

*Brown v. 3M*, 265 F.3d 1349 (Fed. Cir. 2001) ............................................................................. 5

*Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed Cir. 2003) ......................................... 5

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) ....................................... 19

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ....................................... 3

*MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*, No. CV 13-303-LPS, 2015 WL 4035049 .... 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014) ................................ 5, 10

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ............. 4, 5

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................... passim

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013) ............. 11

*Raytheon Co. v. Roper Corp.*, 724 F.2d 951 (Fed. Cir. 1983) .................................................... 19

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004) ....................... 19

*U.S. Surgical v. Ethicon, Inc.*, 103 F. 3d 1554, 1568 (Fed. Cir. 1997) ......................................... 4

*V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) ....................... 4

## I.      ONE OF ORDINARY SKILL IN THE ART

Plaintiff proposes that one of ordinary skill in the art be defined as a person with at least at least a bachelor's degree in computer science, electrical or computer engineering, or a related technical field, 2-4 years of work experience, and some experience with user interface design and implementation. This person would also have extensive experience in working with spreadsheet applications. Additional work experience could offset less educational experience, or additional education could offset less work experience.

## II.      OVERVIEW OF PATENTED TECHNOLOGY

Plaintiff is asserting five separate patents against Defendant in this action, all of which relate to spreadsheet technology. Three of the five, 5,784,545 ("'545 patent"), U.S. Patent Nos. 6,282,551 ("'551 patent"), and 5,590,259 ("'259 Patent") relate to the concept of integrating a tabbed user interface with a three dimensional spreadsheet. Each of these patents claims priority back to the early 1990s, a time when electronic spreadsheets, and the massive advantages they offer over paper ledgers, were first being popularized. Some of the advantages highlighted by the patents are that a single page of a spreadsheet can hold vastly more information than could ever be contained on a sheet of paper. Another advantage is the use of formulas within spreadsheets where cells automatically recalculate as the underlying data in the spreadsheet changes. As the patents explain, however, in the early 1990s spreadsheet technology was hardly "user friendly:"

> While electronic spreadsheets offer significant productivity gains in the task of complex data modeling, none has been as intuitive to use as ordinary paper and pencil—objects already familiar to the user. Instead, the user must master many complex and arbitrary operations. To find the proper command for a task at hand, for example, the user must hunt through a complex menuing system, with the desired choice often buried under several menus. Even

'551 Patent at Col 2, lines 26-39. This problem was especially acute for sophisticated spreadsheets with advanced capabilities. One clear example of this was three dimensionality. This technology, present before the inventions, allowed for multiple spreadsheet pages to be contained within a single computer file. These spreadsheets allowed for calculation and manipulation of data across these multiple pages. This feature had the potential to be extremely useful, but the user interfaces of these spreadsheets were deficient and led to these features being underutilized.

The key innovation of the '545, '551, and '259 patents was to reimagine the three dimensional electronic spreadsheet, typically thought of as a cube of data, using a notebook metaphor. Under this mode of thinking, each page of the spreadsheet was assigned its own individual tab as is shown in figure 4G below.



FIG. 4G

This user interface model, and the innovations associated with it, were critically and commercially popular. In fact this shift in thinking about spreadsheets was so profound, that it is difficult today to conceive of a spreadsheet application lacking the basic structure shown in Fig. 4G.

The fourth of the five asserted patents, U.S. Patent No. 5,623,591 ("'591 patent") is directed towards building graphical applications within the confines of a spreadsheet program. This innovation allowed very advanced spreadsheet users to build customized spreadsheet applications. These applications could then be distributed to, and used by, end users who would experience the advantages of being able to enter, retrieve and manipulate spreadsheet data through a user interface, rather than directly interacting with the spreadsheet.

The final asserted patent, U.S. Patent No. 5,303,146 ("'146 patent") is directed to creating and managing various versions of a spreadsheet. Essentially, it provides a "track changes" feature which automatically determines changes to a spreadsheet, and marks those changes for the user.

## III. RELEVANT LEGAL STANDARDS

This Court knows well the general principles of claim construction set forth in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Generally, "the words of a claim are given their ordinary and customary meaning," which is the meaning conveyed "to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quotation omitted). The main source for determining the meaning of claims is the intrinsic record: the claims, the specification, and the prosecution history, which includes any prior art cited during examination of the patent. *Id.* at 1313–17. Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification. *Id.* at 1315–16.

A court may also consider extrinsic evidence to "shed useful light on the relevant art," though such evidence is "less significant than the intrinsic record." *Id.* at 1317 (quotation omitted). Even when extrinsic evidence is consulted, "[t]he intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms." *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005). Technical dictionaries or art-specific sources can be useful "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Phillips*, 415 F.3d at 1318 (quotation omitted).

"While not an absolute rule, all claim terms are presumed to have meaning in a claim." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1119 (Fed. Cir. 2004). This gives rise to the inference that when an inventor used different terms that "he intended his choice of different terms to reflect a differentiation in the meaning of those terms." *Id*.

However, not all terms within a particular phrase must be construed. "Rather, '[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *U.S. Surgical v. Ethicon, Inc.*, 103 F. 3d 1554, 1568 (Fed. Cir. 1997)). Claims are to be construed from the perspective of a person of ordinary skill in the art of the field of the patented invention at the time of the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). If commonly understood words are used in the claims, then the "ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "Elaborate interpretation" is not required. *Id.* (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). To do otherwise would convert claim construction from "a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims," into "an obligatory exercise in redundancy." *U.S. Surgical*, 103 F.3d at 1568. Thus, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*, No. CV 13-303-LPS, 2015 WL 4035049 at *9 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014)). Defendants bear the burden of proving by clear and convincing evidence that a claim is indefinite. *Id.* (citing *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed Cir. 2003)).

## IV.    AGREED CONSTRUCTIONS

The parties have reached agreement regarding construction of certain terms. *See* Ex. E (table of agreed constructions). DET notes that neither party currently proposes any term in U.S. Patent No. 5,590,259 for construction.

## V.    TERMS FOR CONSTRUCTION

The disputed claim terms are included in Exhibit F. There is one term in dispute for the '545 patent, one term in dispute in the '551 patent, and five terms in dispute in each of the '591 and '146 patents.

### a.    U.S. Patent No. 5,784,545

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Single disk file | Plain and ordinary meaning. No construction necessary. | Stored in a file on a single physical disk. |

There is one term in the '545 patent at issue: single disk file. Defendant seeks to transform the plain language of "single disk file" into a something defined by an action: "stored in a file on a single physical disk." This term appears in two asserted claims of the '545 patent, 1 and 35. In Claim 1, it appears in the limitation "said plurality of spreadsheet pages being stored

in a single disk file" and in Claim 35 it appears in the limitation "each of said plurality of spreadsheet pages is stored in a single disk file."[1]

The phrase "single disk file" is used once in the specification (outside of the claims):

resizing, and deleting. In a preferred embodiment, the note-book 250 includes 256 spreadsheet pages and one Graphs 60 page, all of which are saved as a **single disk file** on the mass storage 107. In accordance with the present invention,

*See* '545 patent, Col. 7, lines 59 – 62. This passage tells one of ordinary skill in the art that, in a preferred embodiment, the entire notebook, which includes multiple spreadsheet pages and a graphs page, is saved "*as* a single disk file", not "*on* a single disk file" as Defendant contends, but instead "on a mass storage."

In the specification, disk files are always discussed as notebook files. Explanatory language regarding a disk file in the specification provides:

determine whether it is a notebook identifier. In a preferred method, a notebook identifier is delimited, for example, by bracket symbols; alternatively, a notebook identifier may be realized simply by the position of the identifier relative to other tokens in the string, or by its relationship to **disk (notebook) files** on mass storage 107. If the notebook is

*See* '545 patent, Col. 17, lines 26 – 31. Defendant cannot overcome this clear and consistent use of the term in the intrinsic evidence. Single disk file, simply means, a single file. The word "physical" never appears in the specification or in any discussion in the file history and there is simply no indication that the patentee intended to limit the invention to any particular

---

[1] The phrase also appears in unasserted claim 18 in the phrase "storage device for storing said plurality of spreadsheet pages in a single disk file."

hardware configuration. Instead, the patentee only discusses particular hardware implementations as one possible embodiment:

> As shown in FIG. 1A, the present invention may be embodied on a computer system such as the system **100**, which comprises a central processor **101**, a main memory **102**, an input/output controller **103**, a keyboard **104**, a pointing device **105** (e.g., mouse, track ball, pen device, or the like), a display device **106**, and a mass storage **107** (e.g., hard disk). Additional input/output devices, such as a print-

*See* '545 patent, Col. 5, lines 26 – 35. And even in this embodiment, a "mass storage," of which a hard disk is merely presented as one example is disclosed. Nowhere in the patent is there any indication that the patent should be limited to a single physical disk.

Additionally, the extrinsic evidence supports the plain and ordinary meaning, as there is nothing in the term "file" or "disk file" that would suggest to one of skill in the art that the file must be stored on a single physical disk. For example, dating back as far as 1966, one of skill in the art would have understood that "files" may be stored in a variety of mediums. For example a definition of "file" taken from that time period notes: "The word file is used in the general sense to mean any collection of informational items similar to one another in purpose, form, and content. The term may be applied to a punched-paper tape"[2] Nor is there some distinction between "disk file" and file, as for example, the entire definition of "disk file" in Webster's Pocket Dictionary of Computer terms reads: "See file."[3] Webster's definition of "File" provides even more support, referring to a file as "A set of related information . . . that is identified by a unique name and stored as a unit."[4] Note, that the definition does not say anything about being stored on a single physical disk. Instead, the

---

[2] *See Computer Dictionary*, 1966 (definition of "file") Attached as Exhibit A.
[3] *See Webster's Pocket Computer Dictionary*, 1997 Attached as Exhibit B.
[4] *Id.* (definition of "File").

definition is merely concerned that the file must be stored as a single unit. Finally, yet another dictionary from around the time of the patent defines "file" as simply: "a collection of data identified by a file name."[5] The term is not and should not be limited to a single implementation on a single physical disk as Google contends.

### b. U.S. Patent No. 6,282,551

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Storing said first and second pages of the plurality of cell matrices such that they appear to the user as being stored within a single file | Storing said first and second pages of the plurality of cell matrices such that they are accessible by a single file name. | Indefinite. |

The '545 patent, discussed above, is a continuation of U.S. Patent No. 5,416,895, from which the '551 patent also descends. The '545 and the '551 share a specification and the '551 patent is terminally disclaimed from any portion of its term that would exceed the '545's term. Therefore, the discussion of "single disk file" above is also relevant to this term as those passages also appear in the specification of the '551. Defendant appears to take issue with the use of the phrase "appear to the user".[6] This is not clear however, as Defendant has not specified in its invalidity contentions or the joint claim construction chart which portion of "storing said

---

[5] 21st Century Dictionary of Computer Terms, 1994 (definition of "File") Attached as Exhibit C.

[6] Plaintiff notes that another court has construed the similar phrase "appears to the user to be the same tool" in a programming context and did not find that term to be indefinite. See *IP Innovation LLC. et al v. Red Hat Inc. et al* 2-07-cv-00447 (E.D. Tex 2009). Similarly, in this district, courts have construed (or adopted agreed constructions for) the terms "reduce the *appearance* of", "reducing the *appearance* of", "retains an *appearance*, human readability, and semantic content of the e-mail messages", and "treated as a local disk drive storage I *appears*…as a private, local disk drive" (all emphasis added). See *IP Innovation LLC et al v. Red Hat Inc. et al* 2-07-cv-00447 (E.D. Tex 2009), Dkt. 87 Exhibit E. See *Summit Summit Data Systems LLC v. EMC Corporation, et. al.* 1-10-cv-00749 (DED) (Dkt. 189) as Exhibit F. See *Tristrata Technology v. Beiersdorf, Inc., et al* 1-96-cv-00346 (DED), Dkt. 90 as Exhibit G. See *Tristrata Technology v. Neoteric Cosmetics, et al* 1-96-cv-00227 (DED), Dkt. 235 as Exhibit H. See *Intellectual Ventures I LLC v. Symantec Corporation et al.* 1-10-cv-01067 (DED), Dkt. 425 as Exhibit I. See *Intellectual Ventures I LLC v. Trend Micro Incorporated et al* 1-12-cv-01581 (DED), Dkt. 206 as Exhibit J.

first and second pages of the plurality of cell matrices such that they appear to be stored within a single file" cannot be construed.

The claim language does not use technical terms and is easily understandable. The definiteness standard mandates clarity, while recognizing that absolute precision is not necessary. *Nautilus, Inc. v. Biosig Instruments, Inc.* 134 S. Ct. 2120, 2129 (2014). It is clear that the first and second pages are perceived by the user as being stored within a single file, and thus being able to be accessed from what looks like one file, even if they are not stored by the program within a single file. The patentee uses "appear" consistently throughout the patent to mean perceived by the user:

> actual object for. inspection. The object which **appears** on the screen to the user (i.e., view object) is not necessarily the object which will be inspected. For example, it would be

Col. 20, lines 35 – 38.

> Edit menu (available from menu bar **210**). Tool **220** creates "powerbuttons" which allow a user to run spreadsheet macros; in a specific embodiment, powerbuttons **appear** as floating objects in a layer above spreadsheet cells. In a similar fashion, the graph tool **223** creates floating graphs that appear above spreadsheet cells.

Col. 7, lines 20 – 25.

The Supreme Court in Nautilus explained that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Nautilus, Inv. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129-30 (2014). In the computer arts, it is not

uncommon for the interface presented to the user to be as simple and intuitive as possible, while more complicated processes happen behind the scenes.  As described in the specification:

> ascertained by the user. The notebook interface of the present invention provides a convenient means for organizing many spreadsheets together into one file. This permits the user to load (into memory 102) all related information with a single command, without having to remember a variety of different file names. Moreover, the notebook

'551 patent Col. 11, lines 29–34. Even if the plurality of pages are saved in what appears to the computer as different files, they are stored in such a way that it appears to a user that they are being stored in a single file, simplifying the process for the user, and fulfilling one of the self-described goals of the patent: "providing systems and methods having a highly intuitive interface for users." Summary of the Invention, Col. 3, lines 44–45.

### c.  U.S. Patent No. 5,623,591

#### i.  "linking"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|------|--------------------------------|--------------------------------|
| linking | Plain and ordinary meaning.  No construction necessary. | Bidirectionally linking a property of a cell to a property of a user interface object such that when one object's property is changed, the other's property will be updated. |

"Linking" is a commonly understood term that is used in its plain and ordinary manner in the claim language itself. Construction begins with the language of the claim, and the court "presume[s] that the terms in the claim mean what they say."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312).  Also, "the context in which a term is used in the asserted claim can be highly instructive."  *Phillips*, 415 F.3d at 1314; *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019,

1023 (Fed. Cir. 1997) ("[T]he language of the claim frames and ultimately resolves all issues of claim interpretation."). In claim 1 the term is used in the phrase "linking said value of given cell object with said value property of said user interface object", in claim 3 (dependent on claim 1) it is used in the phrase "linking said display-attribute property of an additional given cell object to that of said additional user interface object", and in claim 13 it is used in the preamble as well as in the phrase "linking the user interface control, so generated, to at least one desired information cell".

In addition, the use of the word "links" in the specification is consistent with the plain and ordinary meaning of "linking" as establishing a relationship between one thing and another. For example at the '591 patent Col. 51, lines 50–53:

> Links establish a relationship between a source object and 50
> a destination object. This relationship will result in a specific
> action when the source object emits a particular outlet.
> Performing this action is "executing" the link. As part of

Instead of proposing a definition for "linking", Google proposes narrowing language that would import unsupported limitations. This attempt to limit, rather than explain, undercuts Google's identification of "linking" as term that must be defined. It is clear from the claim language that Google's unsupported limitation is both confusing and improper.

Google will likely point to the following passage in the Notice of Allowability in support of its proposed construction:

> In accordance with applicant's argument at page 9, and in accordance with the interview with David Slone on 6/7/96, the "displaying said user interface object . . . " limitation at lines 18-20 of claim 1 is to be interpreted to mean that a change in the cell value is reflected in the user interface object. Thus, the interpretation of claim 1 ==as a whole== shall be construed to mean that a bidirectional linking between the cell value property and the user interface object value property exists such that when one object's value property is changed, the other's value property will be updated.

DETFH0002518. It is clear from this passage that the elements of claim 1, taken <u>together</u>, shall be interpreted as meaning that a bidirectional linking between the cell value property and the user interface object value property exists such that when one object's value property is changed, the other's value property will be updated. There is no reason to import this limitation into the term "linking", however, as it is captured by the language of the entire claim, which discloses links in both directions between the cell value property and the user interface object value property. "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of the particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). The language used in Claim 1 is instructive:

**1.** In an electronic spreadsheet system having a memory and a storage device for storing data in a plurality of cell objects, each of said cell objects having a set of properties including a value property, each of the set of properties have associated values, a method for defining selected user interaction with a given cell object, the method comprising:

in response to first user input, generating a user interface object of a predefined type distinct from cell objects, said user interface object having a set of properties including a value property;

in response to second user input, linking said value property of the given cell object with said value property of said user interface ojbect;

displaying said user interface object with a value of said value property corresponding to the value of said value property of the given cell object; and

in response to end-user input that effects a change in the value of said value property of said user interface object, propagating the change to the given cell object so that the given cell object has its value of said value property set to said changed value of said value property of said user interface object.

The value of the property of the given cell objection and the value of the user interface object are linked. Then the user interface object can be displayed with the value of the given cell object, and if there is a change to the value property of the user interface object, that change is made to the given cell object. It is a basic principle of claim construction that claim terms should be construed such that every word in a claim has meaning if possible. *Bicon, Inv. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). The last two claim elements provide bidirectionality, but become superfluous language if the limitation Defendant seeks is inserted into the plain meaning of the term "linking".

    ii.   "displaying said user interface object with a value of said property of the given cell object"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Displaying said user interface object with a | Plain and ordinary meaning. No construction necessary. | Automatically updating the value of said value property of said user |

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|------|-------------------------------|--------------------------------|
| value of said value property of the given cell object | | interface object when the value of the value property of the corresponding cell is changed |

Defendant argues that "displaying" means "automatically updating". The concept that the Defendant is awkwardly attempting to import into this term is amply (and better) described by the claim language that follows the displaying element. Once again, the claim language itself is instructive.

A review of the intrinsic evidence cited by the Defendant shows no intent by the patentee to change the definition of the commonly understood term "displaying". Indeed the examiner specifically states in the Notice of Allowability:

DETFH0002518. This "definition" provided by the examiner, captures the plain meaning of the term. This is consistent with the claim language itself, and the plain and ordinary meaning of the term. The user interface object is "displayed" with the value of the cell. (i.e. a change to the cell value is reflected in the user interface object. Data Engine would not object to definition of the term that matched the examiner's note: "displaying said user interface object such that a change in the cell value is reflected in the user interface object." Data Engine's view, however, is that such a construction is unnecessary because the term is already clear on its face.

iii. "end-user input"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| End-user input | Input by a person who is running a custom application operative in an electronic spreadsheet to perform tasks | Input by a person who is running an application operative in an electronic spreadsheet to perform tasks |

The patent establishes a dichotomy between two types of users. The first type, sometimes called developer and sometimes called "user", is the individual who builds the spreadsheet application. The second type, an "end-user" is the individual who uses the resulting spreadsheet application:

The system of the present invention includes a spreadsheet application development module for building custom applications operative in an electronic spreadsheet. An application is a combination of components which work together to simplify an end user's task. When building an application using the system of the present invention, the user (in a role as developer) can create custom components, including dialog boxes, toolbars, menus, and the like. After creating these components, the user can assemble them into

> an integrated application notebook which comprises all of the programming logic and user interface components for the spreadsheet application.
>
> For purposes of the following description, it is necessary to differentiate between a developer user ("developer") and an end-user ("user"). A developer, as used herein, refers to the person who is building a spreadsheet application. A user, on the other hand, refers to the person who runs a completed application, that is, one who is interested in using the application to perform tasks.

'591 Patent, Col. 25, line 58 – Col. 26, line 54. The parties' agreement regarding the construction of "user input" as well as the claims themselves make clear that when the claims refer to "user" they mean developer, and when they refer to "end-user" they mean the person using the developed application.

The parties agree the term "user input" means "input by a person who is building a custom application operative in an electronic spreadsheet." Data Engine similarly proposes defining "end-user input" in a way that distinguishes it from "user input" for the jury but is also consistent with that agreed definition. By contrast, Defendant's proposed definition would remove one of the inventive features of the patent: the fact that the developer has created a custom application for the end-user. As stated in the specification at Col. 4, lines 9 – 12:

> The present invention also includes a spreadsheet application development module having a user interface (UI) builder for building custom applications operative in an electronic spreadsheet. An application is a combination of

A user who is not running a custom application as described in the specification is not an end-user as that term is used by the patent.

iv. "in response to first user input, generating a user interface object/in response to third user input, generating a user interface object" / "receiving first user input for generating a user interface control of a plurality of different types"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| In response to first user input, generating a user interface object<br><br>Claim 1<br><br>In response to third user input, generating a user interface object<br><br>Claim 3 | Plain and ordinary meaning. No construction necessary. | Generating a user interface object of a predefined type distinct from cell objects in response to a user selecting a user interface object type in a graphical user interface |
| Receiving first user input for generating a user interface control of a plurality of different types for receiving end-user input | Plain and ordinary meaning. No construction necessary. | Receiving user input selecting a user interface control type in a graphical user interface |

Google's proposed construction for these terms would limit "user input" to a "user selecting a user interface object type in a graphical user interface." There is no explanation for why Google believes that one of ordinary skill in the art would understand the term "input" in the "end-user input" terms, but would also understand the same term to be more limited in the "first user input" terms. There is not disavowal, much less the clear disavowal that would be required, of this claim scope.

While there must be a "user interface", a "graphical user interface" is merely a preferred embodiment, as explained at Col. 6, lines 58 – 65 under the section entitled "Detailed Description of a Preferred Embodiment":

> and/or application module **152**. The interface **153**, which is preferably a graphical user interface (GUI), also serves to display results, whereupon the user may supply additional inputs or terminate the session. In a preferred embodiment, operating system **151** is MS-DOS, and interface **153** is Microsoft® Windows; both are available from Microsoft Corporation of Redmond, Wash. Spreadsheet module **152**,

Indeed, the patentee is careful to indicate that it is not limited to the preferred embodiment of spreadsheet applications operative in the Microsoft Windows environment, but that it can be embodied on a variety of different platforms, including Macintosh, UNIX,[7] NextStep and the like.  *See* Col. 7, lines 1 – 17.

Likewise, in the description of the drawings, the patentee is again careful to note that a graphical user interface is just one embodiment:

> FIG. **1C** is bitmap screen shots illustrating the basic architecture and functionality of a graphical user interface in which the present invention may be embodied.

Defendants cannot overcome this clear evidence from the specification, and cannot show that the clear disavowal of claim scope that would be required to import such a limitation. Features of a preferred embodiment must not be read into the claims as new limitations.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004); *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 880 (Fed. Cir. 2004).   In fact, the Federal Circuit cautioned that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."

---

[7] UNIX is a text based operating system. *See Dictionary of Computer Words,* 1995 (Definition of "UNIX"). Attached as exhibit D.

*Phillips*, 415 F.3d at 1323; *see also Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims."); *Innova/Pure Water*, 381 F.3d at 1117 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect.").

### d. U.S. Patent No. 5,303,146

Unusually, all of the claims of the '146 patent were allowed as filed. See '146 Patent Prosecution History: September 20, 1993 Notice of Allowance (DETFH0000111-113). The examiner required no changes to the claims, and instead noted two different ideas embodied by the invention as novel and nonobvious. First, the examiner noted that tracking different versions of the data model and automatically determining which cells of the data model have changed by comparing cells in the new version and the old version to determine which cells have changed was novel and unobvious. Second, the examiner noted that selecting a capture area that is used as a reference for the data model to be automatically tracked by the system so that a plurality of different scenarios could be captured was also novel and nonobvious.

#### i. "different versions"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Different version | Plain and ordinary meaning. No construction necessary. | User defined scenarios made by modifying the base version |

Claim 1 reads as follows:

> **1.** In an electronic spreadsheet system for modeling user-specified information in a data model comprising a plurality of information cells, a method for automatically tracking different versions of the data model, the method comprising:
>
> (a) specifying a base set of information cells for the system to track changes;
>
> (b) creating a new version of the data model by modifying at least one information cell from the specified base set; and
>
> (c) automatically determining cells of the data model which have changed by comparing cells in the new version against corresponding ones in the base set.

The term "different versions" appears only in the preambles of claims 1 and 26. "Generally, a preamble is not limiting." *Summit 6, LLC v. Samsung Electronics Co.*, No. 2013-1648, 2015 WL 5515331, at *6 (Fed. Cir. 2015) (internal citations omitted). A preamble limits the invention if it is necessary to give life, meaning and vitality to the claim, and is not limiting where a patentee uses the preamble only to state a purpose or intended use for the invention. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 1801, 808 (Fed. Cir. 2002). Here, it is clear that the patentee is stating the purpose of the invention. Further, Google's proposed definition provides no insight as to what is "different" about "different versions", further solidifying that this term need not be construed.

ii. "new version"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| New version | Plain and ordinary meaning. No construction necessary. | New user defined scenario made by modifying the base version |

Google does not define "new" or "version" in its proposed definition. Rather, it seeks to have "version", when used in the phrase "new version" mean "scenario" but, when used in the

term "base version", Defendant does not see the need to define "version". The claims themselves provide substantial guidance as to the meaning of particular claim terms, and the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (internal citations omittied). As claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Id.* Certainly, if a term is used twice in one claim, it is presumed that it has the same meaning in all of the places within that claim that it is used.

Likewise, dependent claim 13 adds the limitation of "capturing the new version as a user-nameable scenario". Ordinarily, when different terms are used in a patent, it is presumed that they carry different meanings. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). As "scenario" is used in a dependent claim, it should not be imported into the independent claim as a replacement for "version." Indeed, version is far more readily understood, so to replace it with the obtuse "scenario" does not add clarity.

iii. "base version"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|------|-------------------------------|--------------------------------|
| Base version | Plain and ordinary meaning. No construction necessary. | A single user defined reference version which is modified to create a new scenario |

In contrast to its arguments for "different version" and "base version", here Defendant argues that "version" means "version", belying the assertion that the term "version" needs construction, or that a "version" must be a "scenario". Rather, the base version is simply the baseline version against which changes are tracked, as explained within the claims themselves. It does not need to be user defined as "[t]he base, which serves as a reference against which

various scenarios may be compared, is typically the same as one's normal (unaltered) spreadsheet model." Col. 9, lines 39 – 42.

iv. "specifying"

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Specifying a base set of information cells | Plain and ordinary meaning.<br><br>No construction necessary. | User selecting a set of cells in an open notebook as a base set from which user defined scenarios are created |

As noted earlier, one of the novel and nonobvious inventions of the '146 patent, according to the examiner, is the user being able to select a specific set of cells in the spreadsheet to track. This is claimed explicitly in nonasserted Claim 2:

> 2. The method of claim 1, wherein step (a) comprises: selecting a capture area comprising information cells which the system is to automatically track; and capturing as the base set information in the capture area which the user desires to serve as a reference against which new versions are compared.

As this Court has noted often, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Pragmatus Mobile, LLC v. Amazon.com, Inc.*, No. CV 14-436-LPS, 2015 WL 6348221, at *2 (D. Del. Oct. 16, 2015) (citing *Phillips v. AWH Corp.*, 415 F.3d 1314-1315). That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and a dependent claim, and one party is urging that that the limitation in the dependent claim should be read into the independent claim. *Id.* (citing *SunRace Roots Enter. Co., Ltd. v. SRAM* Corp., 336 F.3d 1298, 1303 (Fed. Cir. 2003)).

That is the situation here. If Google is correct that "specifying" must mean "selecting a set of cells" then Claim 2 has no meaning. As the specification notes, "In a *preferred embodiment*, a capture area may be selected from a notebook, page, or block, with a default value of page. Alternatively, the system may automatically determine the capture area, for example, from a bounding box which includes all cells changed by the user." Col. 12, lines 54 – 59 (emphasis added). In other words, the area may be "specified" without any "selection" at all because the system may provide a default setting or automatically determine the capture area.

> v. "maintaining the new version by storing additional information for only those portions determined to have changed'

| TERM | PLAINTIFF'S PROPOSED DEFINITION | DEFENDANT'S PROPOSED DEFINITION |
|---|---|---|
| Maintaining the new version by storing additional information for only those portions determined to have changed | Plain and ordinary meaning.<br><br>No construction necessary. | Maintaining the new version by storing only portions of the new version which have changed when compared against the base version |

A close reading of the term and Defendant's proposed definition shows that Defendant seeks to replace "additional information for only portions determined to have changed" with "portions of the new version which have changed when compared against the base version." Presumably Google is seeking to have its proposed definitions for "new version" and "base version", if adopted by this Court, inserted into a portion of the claim in which they are not mentioned at all. There is no support for this proposed substitution of language. All of the terms in this phrase have a plain and ordinary meaning that will easily be understood by a jury and the claim language as its stands articulates the method of the invention clearly. This clear language should not be muddied.

## VI.    CONCLUSION

DET requests that the Court adopt its proposed claim constructions because its proposed constructions more closely adhere to the language set out in the patents themselves and represent how these terms would be understood by a person of ordinary skill in the art.

Dated: July 8, 2015

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Amir Alavi (admitted *pro hac vice*)
Demetrios Anaipakos (admitted *pro hac vice*)
Alisa A. Lipski (admitted *pro hac vice*)
Jamie A. Aycock (admitted *pro hac vice*)
Benjamin Foster (admitted *pro hac vice*)
Kenneth Young (admitted *pro hac vice*)
AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
aalavi@azalaw.com
danaipakos@azalaw.com
alipski@azalaw.com
jamieaycock@azalaw.com
bfoster@azalaw.com
kyoung@azalaw.com

*Attorneys for Plaintiff*
*Data Engine Technologies LLC*