IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DATA ENGINE TECHNOLOGIES LLC,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　C.A. No. 14-1115-LPS
　　　　　　　　　　　　　　　　　　)
GOOGLE INC.,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE

Alisa A. Lipski, Amir H. Alavi, Benajmin Foster, Brian E. Simmons, Demetrios Anaipakos, Jamie Aycock, Timothy C. Shelby, AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING  PC, Houston, TX

　　　Attorneys for Plaintiff.

Frederick L. Cottrell, III, Jason James Rawnsley, RICHARDS, LAYTON & FINGER, PA, Wilmington, DE

Darcy. L. Jones, Heather S. Kim, Jeffrey J. Toney, John W. Downing, Jonathan K. Waldrop, Marcus A. Barber, KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, Redwood Shores, CA

Rodney R. Miller, KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, Atlanta, GA

　　　Attorneys for Defendants.

**MEMORANDUM OPINION**

February 29, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff Data Engine Technologies LLC ("Plaintiff") filed this patent infringement suit against Defendant Google Inc. ("Defendant") on September 2, 2014. (D.I. 1) Pending is the issue of claim construction for several disputed terms in four patents-in-suit: U.S. Patent No. 5,784,545 ("the '545 patent"), U.S. Patent No. 6,282,551 ("the '551 patent"), U.S. Patent No. 5,623,591 ("the '591 patent"), and U.S. Patent No. 5,303,146 ("the '146 patent").[1]

The '545 patent, entitled "System and Methods for Improved Spreadsheet Interface with User-Familiar Objects," was filed on April 10, 1995 and issued on July 21, 1998. The patent generally discloses an electronic spreadsheet system that enables quick access to multiple spreadsheet pages. (See '545 patent at Abstract) The '551 patent has the same title as the '545 patent and relates to the same general subject matter. (See '551 patent at Abstract) The patent was filed on July 20, 1998 and issued on August 28, 2001. The '591 patent, entitled "System and Methods for Building Spreadsheet Applications," was filed on September 10, 1993 and issued on April 22, 1997. It discloses a system that enables developers to build interfaces and applications for use in spreadsheet software. (See '591 patent at Abstract) Finally, the '146 patent, entitled "System and Methods for Improved Scenario Management in an Electronic Spreadsheet," discloses a "scenario manager" that allows users to track changes between different versions of a spreadsheet. (See '146 patent at Abstract) This patent was filed on March 11, 1993 and issued on April 12, 1994.

---

[1] The patents can be found in the record at D.I. 53.

The parties initially completed claim construction briefing on December 17, 2015.[2]  (D.I. 87, 89, 99, 103, 115, 116)  The Court held a claim construction hearing on December 21, 2015. (D.I. 120) ("Tr.")  In light of new positions Plaintiff offered for the first time at the hearing, the Court permitted Google to file a follow-up letter brief, which it did on January 8, 2016.[3]  (D.I. 121)  Thereafter, on February 17, 2016, Defendant submitted a supplemental letter containing excerpts from a deposition of Istvan Cseri, the sole inventor of the '591 patent.  (D.I. 149)  On February 23, 2016, Plaintiff submitted a supplemental letter responding to the deposition excerpts.  (D.I. 151)[4]

---

[2]Plaintiff's original position for most of the disputed terms was that no construction is necessary.  (*See* D.I. 89)  Based on an initial review, the Court ordered Plaintiff to provide a construction for these terms and allowed Defendant to respond to these constructions in a supplemental brief.  (D.I. 113)  While the discussion below primarily considers Plaintiff's alternative proposed constructions, Plaintiff's preference for most of the terms remains that no construction is necessary.  (*See* Tr. at 42)

[3]At the hearing, Plaintiff made arguments that relate to litigation between Plaintiff and IBM.  (*See* Tr. at 116, 121-22)  Because these arguments are based on documents that were not fully disclosed to Defendant, the Court will not consider them.  (*See id.* at 122) (explaining that document upon which Plaintiff relied was "marked confidential by IBM" and so could not be shared with Defendant)

[4]While the Court has considered this evidence, an inventor's opinion generally is not entitled to much (if any) weight in the claim construction process.  *See Howmedica Osteonics Corp. v. Wright Med. Tech.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) (explaining "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance" and holding that "inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction"); *see also Andrulis Pharm. Corp. v. Celgene Corp.*, 2015 WL 3978578, at *5 (D. Del. June 26, 2015) (describing inventor's testimony, taken 15 years after patent issued, as "useless").  While an inventor's testimony "may be pertinent as a form of expert testimony," *Howmedica Osteonics Corp.*, 540 F.3d at 1347 n.5, neither party in this case is offering Cseri's testimony for that purpose.

As in *Andrulis*, the inventor testimony offered here was taken many years after the patent was filed.  Indeed, at the time of the his deposition, Cseri testified that he was no longer even

I.      **LEGAL STANDARDS**

Claim construction is a question of law.  *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135

S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91

(1996)).  "It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism

for conducting claim construction." *Id.* at 1324.  Instead, the court is free to attach appropriate

weight to sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . .

[This is] the meaning that the term would have to a person of ordinary skill in the art in question

at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at

1312-13 (internal citations and quotation marks omitted).  "[T]he ordinary meaning of a claim

term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal

quotation marks omitted).  The patent specification "is always highly relevant to the claim

construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a

disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular

claim terms," the context of the surrounding words of the claim also must be considered.

_____

familiar with the patent.  (*See* D.I. 151 Ex. A at 10) ("To be honest, I completely forgot about this
patent . . . before I saw it yesterday.")  Consequently, the Court did not give much weight to the
deposition.  Nevertheless, the Court notes that the testimony supports the Court's constructions
for the "linking" claim term and does not clearly contradict the Court's constructions for any of
the other terms.  (*See* D.I. 151 Ex. A at 12) (explaining that changes are propagated
"automatically," consistent with Court's construction of "linking" term)

*Phillips*, 415 F.3d at 1314.  Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ."  *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . .  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id.* at 1314-15 (internal citation omitted).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  *Id.* at 1316.

It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intent to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent."  *Phillips*, 415 F.3d at 1317.  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

4

invention in the course of prosecution, making the claim scope narrower than it would otherwise

be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence

and to consult extrinsic evidence in order to understand, for example, the background science or

the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at

841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d

at 980. For instance, expert testimony can be useful "to ensure that the court's understanding of

the technical aspects of the patent is consistent with that of a person of skill in the art, or to

establish that a particular term in the patent or the prior art has a particular meaning in the

pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and

testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from

bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be

useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely

to result in a reliable interpretation of patent claim scope unless considered in the context of the

intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the

scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney

Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90

F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns

with the patent's description of the invention will be, in the end, the correct construction."

*Renishaw PLC v. Marposs Societa` per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows

that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II.    PERSON OF ORDINARY SKILL IN THE ART

The parties do not agree on who a person of ordinary skill in the art ("POSA") would be in the context of the patents-in-suit.  Plaintiff contends that a POSA is:

> a person with at least a bachelor's degree in computer science, electrical or computer engineering, or a related technical field, 2-4 years of work experience, and some experience with user interface design and implementation. This person would also have extensive experience in working with spreadsheet applications.  Additional work experience could offset less educational experience, or additional education could offset less work experience.

(D.I. 89 at 1)  Defendant, by contrast, argues that a POSA "would have had an undergraduate degree in Computer Science, or equivalent course work, and two or more years' experience working as a programmer or software user interface designer with general familiarity with databases and/or spreadsheet-style applications."  (D.I. 87 at 1)

The Court agrees with Plaintiff.  While the parties' proposals are similar, there is one notable difference.  Whereas Plaintiff's proposed POSA has extensive experience with spreadsheet applications, Defendant's proposed POSA has general familiarity with database and/or spreadsheet-style applications.  Because the patents-in-suit each relate to spreadsheet applications, and because it is not clear what constitutes a "spreadsheet-style application," the

Court adopts Plaintiff's proposal for the POSA.[5]

## III.   DISPUTED TERMS

### A.   "single disk file"
('545 patent claims 1 and 35)

| Plaintiff's Proposal | "single electronic file" |
| --- | --- |
| Defendant's Proposal | "stored in a file on a single physical disk" |
| Court's Construction | "single electronic file" |

Defendant's proposed construction requires that a file be stored on a single physical disk, and would exclude files that are saved across multiple drives or devices.  The Court agrees with Plaintiff that storing a file on a single physical disk is not a requirement of the claims.

The intrinsic evidence supports Plaintiff's position.  The phrase "disk file" appears in the patent as an independent term.  The specification states, for instance, that the name of a notebook "is displayed in the titlebar . . . and is used as the name for the corresponding *disk file*." ('545 patent at 15:50-51) (emphasis added)  The fact that "disk file" is used as a stand-alone phrase while "single disk" is not supports Plaintiff's construction.

In defending its proposed construction, Defendant points to parts of the specification indicating that the "single disk file" is stored in the "mass storage" of the file system.  (D.I. 87 at 15)  In making this argument, Defendant appears to argue that the claims should be limited to the disclosed single-disk implementation.  This would improperly import limitations from the patent

___

[5]The parties agree that the outcome for all but one of the disputed terms – "storing said first and second pages of the plurality of cell matrices such that they appear to the user as being stored within a single file" in the '551 patent – would be the same regardless of how the Court defines the POSA. (*See* Tr. at 124-25, 127-28)  In fact, the Court has found that none of the claim construction disputes hinge on the difference between the parties' proposed POSA definitions.

specification into the patent claims.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1339 (Fed. Cir. 2001).  The portion of the patent that refers to "mass storage" explicitly indicates that the invention is not limited to the implementation described in the specification and that the invention "is not limited to any . . . particular [computer] environment." ('545 patent at 6:1-12)  Further, even if a mass storage system were required, Defendant has failed to show that a "mass storage" system must necessarily be located on a single disk.  Defendant's extrinsic evidence does not support such a conclusion.  By contrast, Plaintiff's expert shows how a person of ordinary skill in the art at the time the patent was filed would have been able to design a mass storage system that could save a single file across several physical disks. (*See* D.I. 104 at 2-3)

**B.** **"storing said first and second pages of the plurality of cell matrices such that they appear to the user as being stored within a single file"**
('551 patent claim 1)

| Plaintiff's Proposal | "storing said first and second pages of the plurality of cell matrices such that they are accessible by a single file name" |
|---|---|
| Defendant's Proposal | Indefinite |
| Court's Construction | "storing said first and second pages of the plurality of cell matrices such that they are accessible by a single file name" |

Defendant contends that this term is indefinite because "appears to the user" depends on "the unrestrained opinion of a particular individual." (D.I. 87 at 17)  The Court disagrees.

Indefiniteness is a question of law.  *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  The facts underlying an indefiniteness determination must be proved by clear and convincing evidence.  *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1347 (Fed.

Cir. 2007); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 n.10 (2014).

While questions of appearance can sometimes involve subjective determinations, *see Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350-51 (Fed. Cir. 2005) (finding "aesthetically pleasing" indefinite), here they do not. Whether two pages "appear" to be stored in a single file implicates an objective inquiry. As Plaintiff's counsel put it at the hearing, "[i]t describes what user sees versus what might be happening behind the scenes, how the computer actually processes the information." (Tr. at 115)

Having considered both sides' expert submissions (D.I. 88 at 4; D.I. 104 at 3), the Court concludes that Defendants have failed to meet their burden to prove indefiniteness by clear and convincing evidence. The Court adopts Plaintiff's proposed construction, which is supported by the intrinsic evidence.

**C.    "linking"**
('591 patent claims 1, 3, 13)

| | |
|---|---|
| **Plaintiff's Proposal** | "establishing a relationship" |
| **Defendant's Proposal** | "bidirectionally linking a property of a cell to a property of a user interface object such that when one object's property is changed, the other's property will be updated automatically" |
| **Court's Construction** | No construction necessary |

Prior to the hearing, it appeared the parties may have disagreed as to whether all of the claims implicated by this dispute necessarily require a bilateral connection between two connected objects and automatic updating. (*See* D.I. 89 at 13; D.I. 99 at 17) At the hearing, it became clear that the parties agree that with respect to the method of the three claims implicated by this dispute, the linking must be bidirectional and automatic. (*See* Tr. at 71, 75) To the extent

there remains a dispute, the Court agrees with Defendant that after a link is established, any changes to one object are automatically propagated to the other.  (D.I. 121 at 5)  Having made this determination, the Court does not believe that construction of "linking" is necessary.

D.   **"displaying said user interface object with a value of said value property corresponding to the value of said value property of the given cell object"** ('591 patent claim 1)

| Plaintiff's Proposal | "displaying said user interface object such that a change in the cell value is reflected in the user interface object" |
|---|---|
| Defendant's Proposal | "automatically updating the value of the value property of said user interface object when the value of the value property of the corresponding cell is changed" |
| Court's Construction | "displaying said user interface object such that a change in the cell value is reflected in the user interface object" |

The parties do not appear to have a material dispute with respect to this claim term.  The only potentially material difference between the two proposed constructions is the inclusion of the word "automatic."  But, as Plaintiff observes, the requirement that the cell value is automatically updated is adequately captured by a later limitation in the term explaining that the system "propagate[s] the change to the given cell object."  (*See* D.I. 89 at 15; *see also* '591 patent at 85:18-23)  Accordingly, the Court adopts Plaintiff's proposed construction.

### E.   "end-user input"
('591 patent claims 1, 3, 13, 15)

| Plaintiff's Proposal | "input by a person who is running a custom application operative in an electronic spreadsheet to perform tasks" |
|---|---|
| Defendant's Proposal | "input by a person who runs a completed application to perform tasks" |
| Court's Construction | "input by a person who runs a completed application to perform tasks" |

Both parties agree that "end-user input" refers to input by a user running an application created according to the '591 patent.  (*See* D.I. 99 at 20; D.I. 103 at 9)  The parties' disagreement centers on which proposed construction provides the most clarity.  Defendant's construction appears to come directly from the specification, which states that end-user "refers to the person who runs a completed application . . . to perform tasks." ('591 patent at 25:59-26:53)  Because this language is clear and succinct, and is supported by the specification, the Court adopts Defendant's proposed construction.

**F.** **"in response to . . . user input, generating a user interface object"; "receiving first user input for generating a user interface control of a plurality of different types for receiving end-user input"**
('591 patent claims 1, 3, 13)

| Plaintiff's Proposal | "generating a user interface object of a predefined type distinct from cell objects in response to a user selecting a user interface object type"/"receiving user input selecting a user interface control type" |
|---|---|
| Defendant's Proposal | "generating a user interface object of a predefined type distinct from cell objects in response to a user selecting a user interface object type in a graphical user interface"/"receiving user input selecting a user interface control type in a graphical user interface" |
| Court's Construction | "generating a user interface object of a predefined type distinct from cell objects in response to a user selecting a user interface object type"/"receiving user input selecting a user interface control type" |

The dispute arising from these claim terms is whether the terms require the use of a graphical user interface ("GUI"). (*See* D.I. 103 at 10 (recounting and agreeing with Defendant's articulation of dispute)) Defendant argues that a GUI is required, while Plaintiff argues that it is not. Defendant relies primarily on parts of the specification indicating that "the present invention" and "the system of the present invention" use GUIs. (*See* D.I. 87 at 21) In response, Plaintiff argues that the specification only references GUIs when describing preferred embodiments of the invention. (*See* D.I. 89 at 18-19) In Plaintiff's view, the invention may have, but need not require a GUI. (*See id.*) The Court agrees with Plaintiff and will adopt Plaintiff's proposed construction.

A court may depart from the ordinary meaning of a claim term in only two circumstances. *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015). First, a patentee may "act as a lexicographer" by assigning his own definition to a patent claim term. *See id.* Second, a patentee may intentionally disclaim, or "disavow," claim scope. *See id.* A disclaimer or disavowal requires "words or expressions of manifest exclusion or restriction." *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir.2004)). A disclaimer or disavowal may be implicit, but only if it is "so clear that it equates to an explicit one." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012). "The standards for finding lexicography and disavowal are exacting." *Pacing Techs.*, 778 F.3d at 1024 (internal quotation marks omitted).

In particular, the Federal Circuit has found disclaimers of a feature where the patentee unmistakably defined the invention in a way that excluded that feature by prefacing a particular embodiment with language such as "the present invention requires," "the present invention is," "the present invention includes," or "all embodiments of the present invention are." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316–19 (Fed. Cir. 2006); *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). Similarly, when a patent's specification makes clear that a particular feature is necessary or very important to the invention, the patentee may have disclaimed embodiments of the invention that omit the feature. *See Andersen Corp v. Fiber Composites, LLC*, 674 F.3d 1361, 1367 (Fed. Cir. 2007). Additionally, a patentee disclaims patent scope if the patentee "repeatedly disparages an

13

embodiment" of an invention, or when the content of the specification makes clear that that

feature ***cannot*** be part of the claimed invention.  *See Chicago Bd. Options Exch., Inc. v. Int'l Sec.*

*Exch., LLC,* 677 F.3d 1361, 1372 (Fed. Cir. 2012) (patentee's "repeated derogatory statements"

constitute disavowal); *SafeTCare Mfg., Inc. v. TeleMade, Inc.*, 497 F.3d 1262, 1269–70 (Fed.

Cir. 2007); *SciMed*, 242 F.3d at 1342-45.

Here, the claim language refers broadly to a "user interface object."  It does not further

define or describe the term.  Notably, then, the claim does not contain language requiring a

graphical user interface.  Nor does the specification of the '591 patent provide a definition for the

term "user interface object."  Even Defendant does not contend that the patentee here was acting

as its own lexicographer.

Defendant does, however, contend that there is a disclaimer or disavowal, but the Court

disagrees.  Defendant points to parts of the specification indicating that "the system of the present

invention" uses a GUI (D.I. 87 at 21-23), and emphasizes that "[t]he '591 patent consistently

explains that a user generates user interface objects for applications by selecting them from a

graphical user interface such as a toolbar" (*id.* at 23).[6]  Exemplary language, without more, does

not constitute a disclaimer.  None of the statements in the patent are of a type that have been

found to be a disclaimer (i.e., "the present invention is" or "all embodiments of the present

------

[6]As further examples, the specification discloses that "[s]preadsheet applications of the
present invention employ dialog boxes for displaying information and receiving user input" ('591
patent at 29:3-5), "the system of the present invention includes a dialog window toolbar" (*id.* col.
29:31-38), and "notebook pages may be copied or moved using the drag-and-drop editing
techniques of the present invention" (*id.* at 12:19-21).  There is also a toolbox or dialog box in
each of the most pertinent disclosed embodiments and examples.  (*See, e.g.*, '591 patent at Figs.
5B-7H, 11A, 11F-11H, 11J, 12A-15, 25:59-33:45, 35:4-52, 39:40-52, 41:29-34, 42:45-59, 44:50-
45:39)

14

invention are").[7]  Defendant has not identified any part of the specification demonstrating (either implicitly or explicitly) that the invention must use a GUI, that a GUI is very important to practicing the invention, or that the invention cannot be practiced without a GUI.  Nor, finally, has Defendant identified any language disparaging interfaces without a GUI.  At bottom, the specification does not make clear that the invention requires a GUI.

Accordingly, the Court will not deviate from the plain and ordinary meaning of the disputed term, a meaning captured by Plaintiff's proposed construction.

G.     "specifying a base set of information cells"/"base version"
       ('146 patent claim 1)

| Plaintiff's Proposal | "determining a reference set of information cells" |
|---|---|
| Defendant's Proposal | "user selecting a set of cells in an open notebook as a base set from which user defined scenarios are created" |
| Court's Construction | "determining a reference set of information cells" |

The essence of this dispute is whether the set of cells used to form the "base version" of data must be chosen by the user, as argued by Defendant, or whether the base set can be determined automatically by the software system, as Plaintiff counters.  The Court agrees with Plaintiff.

---

[7]The Court does not find another statement in the specification – "The system of the present invention includes a dialog window toolbar" ('591 patent at 29:31-38) – as meeting the "exacting" standard for a disavowal.  It is difficult to conclude that the patentee clearly limited the scope of its claimed invention to embodiments with "dialog window toolbars" when the patent's claims require only "a user interface object."  Moreover, the specification contains reference to a "user interface," indicating again that the patent is not limited solely to graphical user interfaces. (*See* '591 patent at 6:48-65 ("The system receives user commands and data through user interface."); *see also id.* at Fig. 1B)

Plaintiff's construction is supported by the doctrine of claim differentiation. Each claim in a patent constitutes a different invention. As such, there is a presumption that "each claim in a patent has a different scope." *See Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004). In the '146 patent, step (a) of claim 1 involves "specifying a base set of information cells for the system to track changes." ('146 patent at 14:6-7) Claim 2 depends from claim 1 and further describes step (a).[8] The only difference between claim 1 and claim 2 is that claim 2 incorporates user preference; that is, in claim 2 the base set of information is determined in accordance with what "the user desires." (*Id.* at 14:18) As the Federal Circuit explained in *Phillips*, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." 415 F.3d at 1315. The fact that claim 2 incorporates a limitation relating to user preference, thus, gives rise to a presumption that claim 1 does ***not*** contain such a limitation. Defendant has not overcome this presumption.

Plaintiff's construction is also supported by the specification, which states that the base set may be determined automatically:

> At step 501, ***the user specifies*** a capture area . . . . In a preferred embodiment, a capture area may be selected from a notebook, page, or block, with a default value of page. Alternatively, the system may automatically determine the capture area, for example, from a bounding box which includes all cells changed by the user.

('146 patent at 12:52-60) (emphasis added)

_____

[8]Claim 2 states: "The method of claim 1, wherein step (a) comprises: selecting a capture area comprising information cells which the system is to automatically track; and capturing as the base set information in the capture area which the user desires to serve as a reference against which new versions are compared."

Defendant also contends that its construction is supported by the PTO's Notice of Allowability. (*See* D.I. 99 at 6-7)  The PTO's statement, however, does not address the disputed issue.  Instead, the notice states that "[t]he Examiner considers the recited system and method of modeling user-defined information in a data model spreadsheet . . . to be novel and unobvious" and that "the recited method of selecting a capture area . . . is also . . . novel and nonobvious." (DETFH0000112)  These remarks do not indicate whether the selection of the base set is automatic.  Hence, Defendant's argument is unavailing.

### H.   "new version"/"different versions"
('146 patent claims 1 and 13)

| Plaintiff's Proposal | "new variation"/"different variation" |
|---|---|
| Defendant's Proposal | "new user defined scenario made by modifying the base version"/ "user defined scenario made by modifying the base version" |
| Court's Construction | No construction necessary |

Defendant contends that "the user, and not the system, creates and defines new or different versions" and that "all versions other than the base version are created by modifying the base version." (D.I. 87 at 13)  The Court agrees with Plaintiff that user action is not always required to satisfy this claim limitation.

The claim language does not include a limitation requiring that users create new versions. Notably, the method described in claim 1 describes actions, but does not define actors.  That is, the method involves "specifying a base set," "creating a new version," and "automatically determining cells . . . which have changed." ('146 patent at 14:6-13)  These phrases do not necessarily require user action.

The Court's construction is also supported by the doctrine of claim differentiation.  *See*

17

*Phillips*, 415 F.3d at 1315.  Claim 16 of the '146 patent depends from claim 1 and relates to

"new version[s] created *by the user*."  ('146 patent at 15:15-16) (emphasis added)  The fact that

no other claim in the patent includes a "created by the user" limitation, and that there does not

appear to be any other difference between claim 16 and claim 15 (from which claim 16 also

depends) suggests that the limitation is not present in the other claims.

Finally, while the specification describes tools that enable users to create, save, and name

scenarios, the specification does not contain any language that *limits* the invention to these types

of scenarios.  (*See id.* at 7:65-68) (explaining that invention "*allow[s]* a user at any time to name

and save scenario variations") (emphasis added)

In challenging these conclusions, Defendant contends that the patentee disclaimed

scenarios that are not defined by the user.[9]  But Defendant points to no language in the patent

meeting the "exacting" standard of "words of manifest restriction or exclusion."  Instead,

Defendant relies on the following statement:

> [T]he present invention provides a more powerful and interactive
> approach to scenario analysis in the form of a Scenario Manager.
> The manager automatically tracks value changes as one enters new
> data sets, with the added ability to allow a user at any time to name
> and save scenario variations in report form.

('146 patent at 7:62-68)  This reference to user participation as an "added ability" is not

tantamount to a clear exclusion of embodiments that do not require new versions to be specified

---

[9]Defendant also contends that the preamble ("In an electronic spreadsheet system for
modeling user-specified information in a data model comprising a plurality of information cells,
a method for automatically tracking different versions of the data model, the method comprising .
. . .") is limiting, as it provides an antecedent basis for certain claim terms ("data model"
"different versions") and was relied on during the prosecution. *See Catalina Mktg. Int'l, Inc. v.
Coolsvaings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  The Court does not agree.

by the user.  The Court is similarly unpersuaded by Defendants' arguments about Figures 5A and

5B.  While these figures may "describe" and "summarize" the invention, there is no clear

indication that they are intended to *limit* the invention.[10]  (*See* '146 patent at 12:51-52, 13:18-21)

> I.    **"maintaining the new version by storing additional information for only those portions determined to have changed"**
> ('146 patent claim 26)

| Plaintiff's Proposal | "maintaining the new variation by storing additional information for only those portions determined to have changed" |
|---|---|
| Defendant's Proposal | "maintaining the new version by storing only portions of the new version which have changed when compared against the base version" |
| Court's Construction | "maintaining the new variation by storing additional information for only those portions determined to have changed" |

The parties disagree about whether the invention disclosed in claim 26 considers changes

only with respect to the "base version," or whether the invention can consider changes with

respect to *any* previous version.  The Court agrees with Plaintiff and concludes that the patent

does not require that changes be tracked only against the base version.

Defendant identifies numerous portions of the specification that reference the "base

version" when describing how the invention tracks changes.  (*See* D.I. 99 at 10)  These are

references to preferred embodiments of the invention.  When describing the change-tracking

---

[10]In its supplemental letter brief, Defendant also argued that its construction was supported by the title of the '146 patent.  (*See* D.I. 121 at 3)  Generally, claim limitations are not found in a patent's title.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1312 ("[I]f we do not read limitations into the claims from the specification that are not found in the claims themselves, then we certainly will not read limitations into the claims from the patent title.").

functionality, the specification indicates that its description merely "summarizes" the invention. ('146 patent at 12:50-52) The specification later adds that "there is no intent to limit the invention" to the particular embodiments disclosed in the specification. (*Id.* at 13:57-61; *see also id.* at 13:61-67) The Court perceives no basis to limit the claims to the preferred embodiments.

Finally, Defendant again argues for a disclaimer. Again the Court concludes that Defendant has failed to meet the "exacting" standard to support such a conclusion. None of the statements in the specification clearly state that the invention compares changes only against the base version. *See Biogen Idec, Inc.*, 713 F.3d at 1095. Defendant points to Figure 5B as support for its disclaimer – but then acknowledges that Figure 5B is not entirely consistent with its position. (*See* '146 patent at Fig. 5B) (showing Scenario 3 failing to store at least one change from base version); *see also* D.I. 121 at 3 (Defendant: "With respect to scenario 3 [in Figure 5B], the values in this scenario are inconsistent with what the patent teaches to one skilled in the art . . . .")) At minimum there is ambiguity as to whether the patentee intentionally disclaimed embodiments that are not limited tracking changes against the base version.

## IV.   CONCLUSION

An appropriate Order follows.